TEXASGULF INC. and SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Texasgulf, Inc. v. Commissioner
Docket No. 7950-71.
United States Tax Court
T.C. Memo 1976-39; 1976 Tax Ct. Memo LEXIS 364; 35 T.C.M. (CCH) 158; T.C.M. (RIA) 760039; February 12, 1976, Filed *364 1. The concession granted to a Mexican subsidiary of the taxpayer to mine sulphur by the Mexican Government provided for the payment of a "royalty" measured by the then market value of the sulphur as the sulphur was mined. Subsequently, payment of a part of this royalty was deferred until the sulphur was sold. HELD: The liability for the payment of the royalty accrued when the sulphur was mined, notwithstanding there were no sales of the sulphur. The amount thus accrued could be charged to inventory in the year that the sulphur was mined. Washington Post Company v. United States,405 F.2d 1279 (Ct. Cl. 1969); Lawyers' Title Guaranty Fund v. United States,508 F.2d 1 (5th Cir. 1975). 2. The Mexican subsidiary elected to capitalize exploration and development costs incurred in the development of its Mexican sulphur mine. HELD: The allocable part of such custs were properly included in the cost of its opening inventory for the first year of the filing of a consolidated return by the Mexican subsidiary and its U.S. parent. FURTHER HELD: Cost depletion and amortized development expenses were properly includable in inventory as a part of the cost of sulphur mined beginning in 1958 and for *365 subsequent years, notwithstanding that the inventory was valued at cost or market, whichever is lower. FURTHER HELD: For the purpose of computing the Mexican subsidiary's closing inventory for the taxable year 1960, the fair market value of the sulphur at the mine site was determined to be $ 12.00 per ton. 3. On February 17, 1960, the taxpayer ceased operations at the Mexican mine. A caretaker crew remained on the site of the mine, pending the resolution of the taxpayer's dispute with the Mexican authorities. HELD: The cessation of mining operations on February 17, 1960, did not constitute an abandonment of the mine on account of which the taxpayer was entitled to write off capitalized exploration and development costs and the unrecovered cost of its fixed assets in the taxable year 1960. Richard H. Appert,Haliburton Fales, II,Emanuel G. Demos,Earl L. Huntington, and Meredith P. Crawford, Jr., for the petitioners. Rudolph J. Korbel and Peter W. Matwiczyk, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined deficiencies in the corporate income tax of petitioners for the taxable years 1958, 1959, and 1960 in the amounts of $ 2,999,814.47, *366 $ 961,172.31 and $ 3,779,364.60, respectively. Due to concessions by the parties, the only questions that remain for this Court's determination relate to Compania Exploradora del Istmo, S.A. (hereinafter referred to as "CEDI"), a wholly-owned Mexican subsidiary of Texasgulf Inc. The questions presented are, as follows: (1) Whether CEDI properly accrued royalties due on the sulphur mined during the taxable years 1958 to 1960, inclusive. (2) Whether cost depletion and development costs capitalized or carried as a deferred expense by CEDI may be charged to the cost of the sulphur which had been mined but was not sold during the taxable years 1957 to 1960, inclusive. (3) The determination of the opening inventory of CEDI as to January 1, 1958, on the basis of cost and the determination of the closing inventory of CEDI on December 31, 1960, on the basis of cost or market, whichever is lower. [1]
(4) The loss, if any, sustained by CEDI, which is deductible under section 165 or 167, [2] *367 when operations ceased on February 17, 1960. FINDINGS OF FACT Petitioner Texasgulf Inc., formerly Texas Gulf Sulfur Company (hereinafter referred to as "Texasgulf"), is a Texas corporation, whose executive offices and legal residence at the time of filing the petition herein were in New York, New York. Texasgulf filed consolidated returns with its subsidiaries during the taxable years 1958 through 1960, by virtue of which the subsidiaries have joined with Texasgulf as petitioners herein. For purposes of the present inquiry, however, all questions remaining for decision relate only to Texasgulf's wholly-owned Mexican subsidiary, CEDI. Petitioners' consolidated return for 1958 was filed with the District Director of Internal Revenue, Upper Manhattan District, New York, New York. This was the first year in which CEDI joined as a member of the affiliated group in the filing of a consolidated return. [3] Petitioners' consolidated returns for 1959 and 1960 were filed with the District Director of Internal Revenue, Manhattan District, New York, New York. CEDI was organized *368 under the laws of Mexico on June 18, 1949, for the purpose of exploring and operating mining properties in Mexico, preferably sulphur deposits. CEDI was able to obtain a concession from the Mexican government to explore, produce or sell sulphur only if it were incorporated under the laws of Mexico. At all times pertinent herein, all CEDI's issued and outstanding stock was owned and held by Texasgulf. On August 31, 1949, CEDI entered into a contract with Commission de Fomento Minero (hereinafter referred to as "Fomento"), the mining agency of the Mexican government, whereby CEDI received the right to explore for sulphur in Mexico in an area of 124,000 hectares. One hectare contains 2.471 acres. The contract contained a mandatory relinquishment clause which provided that CEDI could only retain a maximum of 6,000 hectares out of the allotted 124,000 hectares for purposes of development, the balance having to revert back to Fomento. The 6,000 hectares had to be selected within 5-1/2 years from the date of the contract. The contract with Fomento also obligated CEDI to install one or more plants for the extraction of sulphur, the installation of which was to commence by February 1955. CEDI *369 was required to invest a minimum of $ 2 million in such plant. A 2-year construction period was provided for its installation. It was further provided that the terms of the contract would be suspended in the event that CEDI was prevented from carrying out its work on account of a fortuitous event or a force majeure. Under the contract, a strike was explicitly included in the definition of a force majeure.
Regardless of the supply and demand forces for sulphur on the open market, CEDI was required by the contract to produce at no less than 50 percent of capacity. (Furthermore, only the sulphur produced in excess of Mexico's domestic needs could be exported.) The contract further required that CEDI pay a "royalty" on the extraction of the sulphur equal to 15 percent of the value of the sulphur produced. The value was fixed at the f.o.b. mine price quoted in the Engineering & Mining Journal for the month the sulphur was produced. By letters dated March 12, 1957, March 13, 1957, March 23, 1957, and April 5, 1957, the parties amended the above agreement to provide that only the sum of 8.25 Mexican pesos per ton was to be paid as the sulphur was produced and the balance was to be paid when *370 the sulphur was shipped domestically or exported. On or about December 1, 1954, CEDI selected 5997.052 hectares for development pursuant to the terms of its contract, consisting of 1800 hectares at Texistepec and 4197.052 hectares at Nopalapa. Of the total exploration costs incurred, the sum of $ 1,797,251.80 was allocable to Nopalapa. The two areas chosen for development were 19 miles apart and situated in heavy jungle terrain. CEDI's rights to develop Texistepec and Nopalapa were governed by the single contract with Fomento so that any termination of the contract would affect its right to both areas. Nopalapa was the site chosen by CEDI to begin its mining operations. The Nopalapa deposit was smaller and more manageable than the Texistepec deposit. In addition, a portion of the Texistepec deposit extended beyond the area assigned to it under the concession. It was hoped that by establishing a small prototype mining operation at Nopalapa, Texasgulf would better be able to consolidate its overall position in Mexico. Between 1949 and 1954, CEDI drilled a total of 443 exploratory wells, expending a total of $ 3,538,671.98. By 1958, exploration costs of $ 1,797,251.80 were allocable to *371 the Nopalapa sulphur deposit. Development costs, also incurred prior to 1958, with respect to Nopalapa aggregated $ 1,943,735.66, making total exploration and development costs allocable to Nopalapa $ 3,740,987.46. A timely election under section 616 was made in petitioners' first consolidated return to capitalize the development expenditures above described with the following words: Under Section 616(b), Internal Revenue Code of 1954, taxpayer elects to treat as deferred expenses the development expenditures incurred to date for the Mexican sulphur property. Pursuant to CEDI's contract with Fomento, a boiler plant was constructed in the United States at a cost of $ 2.5 million and transported to Nopalapa on a barge under the Mexican registry, upon which it remained mounted at all times. In February 1956, a feasibility report was submitted based on information obtained from exploratory drilling in the area. The report concluded as follows: Using a plant capable of producing 1,000,000 gallons of 335 degree F. water per day, it would take a minimum of 6.02 years to mine the West Nopalapa sulphur deposit. The production rate would be 535.4 long tons of sulphur per day using 1867.7 gallons *372 of 335 degree F. water per ton of sulphur mined. If a portion of the effective heat is lost outside of the area herein considered the mining rate per day would be correspondingly decreased. The calculations in the report were based on optimum conditions e.g. 100 percent effective heating value for input water, 100 percent recovery of contained sulphur in the mineable zone and success in effectively walling off the mineable zone from the gravel-limestone contract by mudding, thereby preventing any loss of water. The 1,867.7 gallon figure used above was stated to be the "absolute minimum for the average water per ton of sulphur that can be expected during the life of the mine." It was concluded, however, that such minimum average could be approached in practice "only through the use of the most ingenious production techniques." The report further concludes that the limestone formation was such that it might "produce some unfamiliar problems in production and possibly the use of modified or newer mining techniques will be required." The minimum reserve figure of sulphur in the deposit was initially estimated to be 1,500,000 tons. Total recoverable reserves were estimated at 1,176,214 *373 tons. As used by CEDI, the term recoverable reserves means "economically" recoverable in relationship to the market price of sulphur. Production at Nopalapa was commenced February 2, 1957. The sulphur was extracted by the Frasch method. In a Frasch sulphur well, there are four pipes set one inside the other. The outermost pipe is 8 or 10 inches in diameter and goes down to and rests on the top of the cap rock. Inside is a 6-inch pipe which extends below the first pipe through the limestone-sulphur strata and rests on the upper portion of the barren anhydrite. Inside the second is a 3-inch pipe which extends almost to the bottom of the sulphur bearing limestone. A collar seals the annular space between the 3-inch pipe and 6-inch pipe just above the end of the inner pipe. Finally, a 1-inch air pipe inside of the 3- nch pipe extends to a depth just above the end of the 3-inch pipe. The 6-inch pipe is perforated at two levels. The upper set of holes permits the escape of hot water into the sulphur formation, and the lower set permits the entrance of the molten sulphur. The introduction of hot water into the sulphur bearing formation through the well equipment is referred to as the "steaming" *374 of a well. The hot water passes down the annular space between the 6-inch pipe and the 3-inch pipe and is discharged through the upper set of perforations into the porous formation where it mixes with and displaces the formation water. The region through which the hot water circulates is heated to a temperature above the melting point of sulphur. The liquid sulphur, being heavier than water, makes its way downward, forms a pool, displaces water around the foot of the well, and enters the well column through the lower performations of the 6-inch pipe. It then rises in that pipe as a water-free sulphur. The height to which the sulphur rises is determined by its specific gravity and the pressure on the hot water. The molten sulphur is forced one-half or two-thirds of the way to the surface. Compressed air released at the bottom of the central 1-inch pipe mixes with the sulphur column and reduces its weight by aeration resulting in its rise to the surface. The ideal sulphur well has underground physical characteristics which permit circulation of the hot water from the well in all directions, and the return flow of molten sulphur. The excess water, after melting the sulphur at the bottom *375 of the well, is removed from the sulphur deposit by another well called a bleed well. As production began at Nopalapa, numerous technical difficulties in the mining of the deposit were encountered, both anticipated and otherwise. CEDI was able to remedy some but not all of these difficulties. The most serious problem involved the porosity of the limestone formation itself. The hot water injected into the deposit was unable to circulate freely within the formation. This prevented the transfer of heat throughout the sulphur dome which was deemed a necessary element to the efficient operation of the mine. On March 21, 1958, just a little over a year after production had commenced, Thomas Townsend, Assistant Treasurer of Texasgulf, (hereinafter referred to as "Townsend") submitted a report indicating that CEDI was producing sulphur at substantially below the break-even point. At that time, the market price of sulphur was $ 19.00 per ton f.o.b. Nopalapa and the cost of production per books was $ 31.92 per ton. Based on the initial estimate of a 1,500,000 ton sulphur deposit at Nopalapa, he calculated the break-even production rate over the life of the mine to be 651 tons per day or 19,537 *376 tons per month, as follows: Break-even
$ 19.00
Variable costs
11.37
Fixed cost per ton at
Break-even
$ 7.63
Divided into total fixed
cost per month of
$ 149,066.80
Equals break-even production
per month of
19,537
Tons
The report pointed out that to the extent CEDI continued to produce sulphur at a cost in excess of the market value, it would incur an additional fixed loss. Thus, for CEDI to absorb such loss in addition to its monthly fixed expenses, CEDI's break-even point over the life of the mine would necessarily have to be increased. As of February 28, 1958, CEDI's average daily production was 253 tons per day. As of November 1958, CEDI had reduced its estimate of the total recoverable reserves at Nopalapa to 950,606 tons. On March 5, 1959, Townsend submitted another break-even report. The market price of $ 19.00 per ton of sulphur was again used. The contribution factor for each ton of sulphur was calculated at $ 7.14. The report indicated that CEDI's break-even point as of January 31, 1959, based on fixed monthly costs of $ 162,355, was 758 tons per day or 22,739 tons per month. At the time, CEDI's average daily production rate was in the vicinity of 300 tons per day. In April of 1959, additional *377 geological analysis established that the Nopalapa dome was not one continuous deposit but consisted of six distinct deposits or lenses. Each deposit was separated by barriers through which the hot water would not circulate. At this time, CEDI lowered its estimate of the recoverable reserves at Nopalapa to 663,618 tons. In May 1959, Townsend was sent to Nopalapa by the Chairman of the Board of Directors of Texasgulf to review operations at Nopalapa. He concluded that no significant reduction of costs could be effected either at the then current level of production or at the minimum level of operations allowable under the concession contract. Throughout this period, the Board of Directors of Texasgulf was exerting constant pressure on the management of Texasgulf to resolve the situation at Nopalapa. On June 18, 1959, the Board issued a resolution authorizing the Chairman of the Board to pursue a course of action which would lead to the sale, trade, lease, exchange, or other disposition of the Nopalapa property or of the stock of CEDI. In November of 1959, one of the directors of Texasgulf, former Governor Shivers of Texas, was sent to Mexico to see if there was any possibility of CEDI's *378 retaining the Texistepec concession if Nopalapa were abandoned. The Mexican officials with whom Governor Shivers spoke were not able to provide any assurance concerning the consequences of abandoning Nopalapa. On December 17, 1959, the Board of Directors passed another resolution authorizing the officers of Texasgulf to sell or otherwise dispose of CEDI or its property or to adjust the contract with Fomento or to make any other arrangements which the Chairman of the Board considered to be in the best interests of Texasgulf. In addition to the foregoing problems, CEDI was also faced with the prospect of increased labor demands from the Mexican labor unions when their contract expired March 5, 1960. One of CEDI's competitors, Pan American Sulphur, had renegotiated a labor contract with the union just the prior year and was forced to make substantial concessions. CEDI had informed Texasgulf as early as May 1959 that it anticipated having to make similar concessions which would result in an effective increase in labor costs of 34 percent of $ 193,138.80 annually. This was exclusive of the additional labor costs that would be involved once the shipment of sulphur began. According to protocol, *379 CEDI opened discussions with the labor union approximately 90 days prior to the expiration of the contract. The union demanded an increase in wages and benefits of 70 percent. It became readily apparent that a labor contract could not be negotiated on terms that CEDI considered favorable. As expected, the labor unions refused to accept an offer by CEDI to continue working at the same wage rates. Since there was no reasonable way to reduce the labor force significantly or to effect any other material reductions in the cost of producing sulphur at Nopalapa, CEDI decided to shut down its mining operations at Nopalapa effective as of February 17, 1960. This action was taken after consultation with the Chairman of the Board of Texasgulf. At the time of the shutdown, a total of 312,000 tons of sulphur had been mined and stockpiled leaving an estimated 350,000 tons yet to be recovered. The average daily production rate for the years 1957 through 1960 was 275 tons, 319 tons, 270 tons and 354 tons, respectively. The average water ratio per ton of sulphur produced from 1957 to 1959 was approximately 4,000 gallons. During this period, the water ratios at Texasgulf's other mines varied from 2,000 *380 to 4,000 gallons per ton. When the shutdown at Nopalapa was called, CEDI dismissed all employees except for a skeletal maintenance crew. Their job was to watch over and protect the inventory stockpile, the plant and equipment, and the warehouse of spare parts. [4] From the start of production in 1957 through the date of the shutdown on February 17, 1960, CEDI's annual costs per ton of sulphur at Nopalapa, as reflected on its books, were as follows: (1)
(2)
(3)
(4)
Other
Gen'l. Exp.
Tons
Production
(Mexico
Year
Produced
Costs
Taxes
Royalties
City)
1957
85,208
1,624,009.35
33,802.91
313,611.03
30,810.36
1958
114,135
1,883,284.29
33,477.28
397,161.65
29,569.74
1959
95,921
1,681,281.06
26,495.69
336,582.24
30,043.97
to
2/17
1960
16,981
236,656.73
4,327.06
57,970.04
0
Total
312,245 * *381 5,425,231.43
98,102.94
1,105,324.96
90,424.07
(5)
(6)
Per Ton Costs
Per Ton Costs
Year
(1 through 4)
Depreciation
Amortization
(1 through 6)
1957
2,002,233.65 / 23.50
379,252.40
335,877.56
2,717,363.61 / 31.89
1958
2,343,492.96 / 20.53
466,171.81
432,622.53
3,242,287.30 / 28.41
1959
2,074,402.96 / 21.63
380,596.76
366,634.21
2,821,633.93 / 29.42
to
2/17
1960
298,953.83 / 17.61
39,932.13
63,145.93
402,031.89 / 23.68
Total
6,719,083.40 / 21.52
1,265,953.10
1,198,280.23
9,183,316.73 / 29.41 The improved production and cost figures for 1960 were the result of CEDI "stripping or highgrading" the deposit whereby production was taken only from the best wells. This is common practice when a mine is about to be shut down. Within a month after the shutdown, CEDI sent a letter to Fomento indicating that it was invoking the force majeure clause of the concession agreement. CEDI considered this clause to be properly invoked due to the impending strike, and the consequent inability to mine at Nopalapa at a profit. CEDI stated that the contract term should be automatically extended for however long the claimed force majeure continued. By a letter dated May 2, 1960, Fomento served notice upon CEDI that in Fomento's opinion, there was no force majeure and that the contract was subject to rescission by Fomento. CEDI was given ninety days within which to prepare a written defense against rescission. CEDI decided to pursue its rights with the Mexican government *382 in order to secure its rights to the above-ground inventory at Nopalapa and also to secure the rights to the Texistepec deposit which contained sulphur reserves of at least 7 million tons. The dispute was submitted to arbitration pursuant to the terms of the contract. On September 23, 1963, the arbitrator ruled in favor of CEDI and declared that the contract between CEDI and Fomento was not rescinded. His report concluded as follows: * * * in the case in question the technical difficulties of the exploitation, and the concurrent one of unprofitableness of the operation of the contracting Company [CEDI], in spite of not being impediments of an absolute nature, have been the cause of placing it in the economical impossibility of continuing to operate while such impediments subsist. Therefore, in spite of the fact that there is no physical impossibility, there exists the only one that could be surmounted in the absurd manner of going ahead with an exploitation at a cost that cannot be recuperated, which in addition to being in detriment of the Company, does not represent a licit advantage for Comision, and neither does it satisfy the national interest involved in the contract. On June *383 17, 1965, a Mexican First Circuit Appellate Court reversed the decision of the arbitrator and held that CEDI had breached the contract and that the contract was rescinded. CEDI appealed from the decision of the First Circuit Court to the Mexican Supreme Court of Justice. In 1967, prior to the decision of the Supreme Court of Mexico, the parties reached a settlement resulting in the Mexicanization of CEDI. Pursuant to the terms of the agreement, Texasgulf was to give Fomento 1/3 of the stock of CEDI without any consideration and was to sell another 1/3 of CEDI stock to Mexican nationals for 1.5 million dollars, which sale took place on credit. It was further agreed that Texasgulf was to make a $ 2,000,000 loan to CEDI. As part of the settlement, Texasgulf was given the rights to the existing sulphur inventory which Texasgulf subsequently removed from Nopalapa over a three-year period from 1968 to 1970, inclusive. The settlement also required that CEDI reenter Nopalapa within a reasonable period of time to begin production again in addition to continuing its exploration operations at Texistepec. Texasgulf was required to furnish whatever technical and financial assistance as was deemed *384 necessary for CEDI's operations. In reopening Nopalapa, the original plant, equipment, and warehouses were repaired and placed back in proper working order. Hot water was first injected into the Nopalapa dome on October 3, 1967. Production was renewed at Nopalapa on October 23, 1967, and continued until January 11, 1971. During this period, a total of 353,865 tons was mined. The average daily production rate was 300 tons. The average water ratio per ton of sulphur produced was slightly in excess of 4,000 gallons. Shortly after the Nopalapa mine was reopened, the market price of sulphur reached $ 42.50. Both prior to and subsequent to the shutdown at Nopalapa, CEDI made several unsuccessful attempts through its parent Texasgulf to dispose of all or part of its assets. In early 1960, CEDI offered to sell its sulphur inventory to the Mexican government at $ 12 per ton, to be paid as the inventory was sold. CEDI also offered to sell its entire mine at Nopalapa, including equipment, for $ 1 million in cash. As part of the proposal, CEDI would have obligated itself to build a plant at Texistepec by 1970 or when the price of sulphur reached $ 30 per ton. The Chairman of the Board of Texasgulf, *385 along with Thomas Townsend, met with officials of the Mexican government shortly before January 21, 1960, to discuss the above proposal. However, the Mexican government did not respond to this proposal. In 1960, CEDI also offered to sell its inventory at Nopalapa to Pan American Sulphur, a chief competitor in Mexico, with no result. Subsequently, in December 1962, CEDI agreed to sell to Gulf Sulphur Corporation all its properties and assets, including the Nopalapa sulphur stockpile, the Nopalapa plant and equipment and its concessions to mine Texistepec and Nopalapa. At the time, Gulf Sulphur was conducting its own drilling operations adjacent to or within a short distance from Nopalapa. In return therefor, Gulf Sulphur agreed to give CEDI a promissory note in the amount of $ 2,000,000, but payable only in annual installments at the rate of $ 6.66 per ton as the sulphur inventory was shipped. Gulf Sulphur further agreed to give CEDI a $ 250,000 promissory note of Compania de Azufre Veracruz, S.A., a subsidiary of Gulf Sulphur and 187,500 shares of Gulf Sulphur common stock valued at $ 4 per share. The contract was conditioned upon (a) CEDI having not less than 300,000 metric tons *386 of sulphur of commercial quality stockpiled at Nopalapa; (b) the delivery of a geologist's certificate that the reserves at the Texistepec property were at least 6,000,000 tons; (c) satisfactory assurance that the sulphur stockpile could be exported from Mexico without the payment of an export tax; (d) proof that CEDI had good and clear title to all assets and properties being sold; and (e) the contract being approved by the Mexican government. The contract was terminated by the parties on March 6, 1964, when government approval for the sale was not forthcoming. With the exception of the immediate post-Korean war years, the price of sulphur from 1919 through 1960 remained fairly stable with its historical high being in the $ 31 per ton range. In December of the taxable years 1957 through 1960, the market price quotations for Mexican sulphur appearing in the Engineering & Mining Journal were as follows: $ M03,00,00,16$ D$ QDecember 1957$ Bf.o.b. mines, Mexican use,$ Q$ Bmetric ton$ Y$ 22.40 - 31.60$ Q$ Bf.o.b. vessel, for export$ Y22.00 - 24.00$ QDecember 1958$ Bf.o.b. mines, Mexican use,$ Q$ Bmetric ton$ Y22.40 - 31.60$ Q$ Bf.o.b. vessel, for export$ Y22.00 - 24.00$ QDecember 1959$ *387 Bf.o.b. mines, Mexican use,$ Q$ Bmetric ton$ Y22.40 - 31.60$ Q$ Bf.o.b. vessel, for export$ Y20.50 - 22.00$ QDecember 1960$ Bf.o.b. mines, Mexican use,$ Q$ Bmetric ton$ Y21.00 - 23.00$ Q$ Bf.o.b. vessel, for export$ Y20.50 - 22.00$ X The market price quotations for Mexican dark sulphur appearing in the Oil Paint and Drug Reporter for the same time period was fixed at $ 23.00 per ton f.o.b. vessel Coatzacoalcos. The figures appearing in the latter journal are generally reputed to be more accurate than those appearing in the former, although neither purport to be completely accurate. Nopalapa was located approximately 43 miles by river from Coatzacoalcos, the nearest port from which sulphur could be loaded for export. In late 1959, CEDI entered into an agreement with Fomento to lease for a term of five years dock space, loading equipment, and machinery, at the port of Coatzacoalcos, in order to ensure that the existing sulphur inventory at Nopalapa could be shipped out. An automatic time extension was provided for in the event of a force majeure. CEDI was charged rent at the rate of $ 2,000 per month for the first 3 months, then $ 4,000 per month until commencement of sulphur shipments *388 began, but limited to a maximum of 24 months, and thereafter at a rental of $ 5,000 per month. CEDI was to be given a preference to extend the lease at the end of its term. The estimated cost of transporting sulphur from Nopalapa to Coatzacoalcos during 1958 to 1960 was $ 4 per ton. No sulphur was sold or exported during the period in question. During the period of operations from 1957 until the mine was shut down in 1960, the petitioner accrued a liability on account of "royalties" in the amount of $ 1,105,324.96, as follows: Year
Amount
1957
$ 313,611.03
1958
397,161.65
1959
336,582.24
1960
57,970.04
Total
$ 1,105,324.96
To the extent that such royalties were paid in cash by CEDI during the taxable years in question, they were allowed as deductions by the respondent. During 1957, CEDI mined 85,208 tons of sulphur. As of December 31, 1957, CEDI's inventory account, carried on its books at cost, consisted of the following items: Production Costs
$ 1,624,009.35
Cost Depletion
335,877.56
Depreciation
379,252.40
Royalties
313,611.03
Taxes
33,802.91
General Expenses (Mexico City)
30,810.36
$ 2,717,363.61
In computing its opening inventory for 1958, CEDI eliminated from inventory the charges for cost depletion, *389 depreciation, royalties, taxes and general expenses and set these items up in a deferred asset account. CEDI then wrote down its inventory account to market value calculated at $ 19.00 per ton, transferring the differential to the same deferred asset account. As a result of the above adjustments, CEDI reported an opening inventory of $ 1,618,955.99 and a deferred asset account of $ 1,098,407.62 on the consolidated return for 1958. [5]
In computing its closing inventory for 1958, CEDI used the lower of cost or market, in conformity with the practice of the affiliated group. Valuing its inventory at $ 18 per ton, CEDI wrote down its inventory by $ 346,675.22, which petitioners claimed as a deduction on their consolidated return for 1958. [6]
Petitioners now claim that CEDI was entitled to an addititional write-down of $ 1,066,910.14 *390 for 1958. Such claim is based on the contention that CEDI's opening inventory for that year should be revised to add back the deferred charge of $ 1,098,407.62 initially eliminated from inventory, subject to a reduction on account of the production taxes in the amount of $ 31,497.48. [7] In the alternative, petitioners argue that the deferred charge should be allowed as a loss in 1960 when mining operations at Nopalapa were shut down. [7]
For the taxable year 1958, respondent does not challenge the valuation of CEDI's closing inventory for the taxable year 1958 at $ 18 per ton. He contends, however, that CEDI's opening inventory should be adjusted in the following manner: Opening inventory per return
$ 1,618,955.99
Addition of deferred charge
1,098,407.62
$ 2,717,363.61
Less: Production taxes
$ 31,497.48
Cost depletion added to inventory cost
335,887.56
Accrued royalties
256,611.03
$ 623,996.07
Revised opening inventory
$ 2,093,367.54
*391 For the taxable years 1957 to 1960, inclusive, CEDI seeks to charge cost depletion (including amortization of development costs) to inventory in the amounts of $ 335,877.56, $ 432,622.53, $ 366,634.21, and $ 63,145.93, respectively. [8] Respondent contends cost depletion (as claimed by petitioner) may only be deducted as a charge against sales. In the event that respondent prevails on this issue, petitioners alternatively contend that the above claimed amounts are properly deductible as a loss in 1960 when Nopalapa was shut down. At the end of the taxable year 1960, CEDI wrote down *392 its inventory from cost to the market value of $ 9.00 per ton. With 312,245 tons of sulphur stockpiled at Nopalapa at such time, the market value of such sulphur was recorded at $ 2,810,205. Added to such figure was the sum of $ 979,831.17, the estimated cost that any bulk purchaser would have to reimburese CEDI on account of the royalties and taxes payable to the Mexican government in the event of a purchase. With a closing inventory at cost of $ 5,654,492.98, CEDI claimed a total deduction in the amount of $ 1,864,456.81 on account of such write-down. Pursuant to stipulation between the parties, the above computations used by CEDI for purposes of claiming a writedown in inventory must be adjusted by eliminating from the closing inventory at cost the sum of $ 39,932.13, representing a depreciation charge incorrectly added thereto. In addition, the estimated royalties and taxes must be eliminated from the computation of inventory at market value. The above adjustments result in an additional write-down in inventory of $ 939,899.04. The decision to set the market value at $ 9.00 per ton was made by Claude O. Stephens, the president and chief executive of Texasgulf. [9] The primary factor *393 upon which the market price was predicated was the displacement cost to Texasgulf. [10] Several other factors were taken into account in reaching such determination, including the lack of transportation from Nopalapa to Coatzacoalcos, the pending litigation with the Mexican government and the lack of an export permit. Respondent has determined that CEDI is not entitled to write down its inventory below $ 16.50 per ton for 1960. [11] On brief, petitioners argue that CEDI's inventory should *394 be valued at no higher than $ 6.66 per ton. On its consolidated return for the taxable year 1960, petitioners claimed a loss on account of CEDI's operations at Nopalapa and Texistepec as follows: Undepreciated basis of plant
and equipment to salvage value
$ 2,760,079.96
Exploration and development,
net of amount credited to
inventory
4,284,126.41
Stores and supplies inventory
to salvage value
603,259.00
Deferred charges, net of amount
included in opening inventory
1/1/58
181,205.99
Uncollectible advances
(not in dispute)
30,682.58
$ 7,859,353.94
It has been stipulated that CEDI's adjusted basis in the above plant and equipment should be increased by $ 39,932.13. [12] *395 With respect to the exploration and development costs, petitioners have conceded that $ 1,741,420.18 of such costs relate to CEDI's Texistepec properties and were prematurely taken. Although initially disputed, respondent now concedes that petitioners made a timely election on their consolidated return for 1958 to capitalize CEDI's exploration and development expenses incurred in preconsolidated years. In addition, petitioners have further conceded that in 1960, $ 155,776.68 in deferred charges were improperly deducted as a loss. Further, the deduction taken by petitioners for uncollectible advances is not in dispute. Giving effect to the above adjustments, the petitioners now claim a total deduction for 1960 in the amount of $ 5,971,406.63 on account of the worthlessness of CEDI's Nopalapa operations. Respondent has disallowed the claimed deduction. OPINION Texasgulf was in the business of mining sulphur, mainly in the United States. During the year 1949, Texasgulf organized CEDI, a Mexican corporation, to explore for sulphur in Mexico pursuant to a concession granted by an agency of the Mexican government. As a result of the drilling of exploratory wells, CEDI selected two sites for development. The one at Texistepec and the other at Nopalapa. The sites were about 19 miles apart and constituted separate mineral properties although subject to a single contract with the Mexican agency so that any *396 default in the case of one property would adversely affect the right to mine the other property. CEDI first undertook to mine the Nopalapa site. The exploration wells and the initial development wells were completed prior to February 2, 1957. By that time, there had been moved to the site the equipment necessary to mine sulphur under the Frasch method, including a large boiler on a barge. From the outset, CEDI encountered difficulties in mining the sulphur at Nopalapa. It was soon ascertained that the deposits were such that sulphur could not be mined at a profit at the then existing market price of sulphur. In fact, in the absence of an unforeseen rise in the market price of sulphur, it was highly doubtful whether a continuation of the mining operations would result in the recovery of the direct costs of mining as distinguished from the amortization of exploration and development costs and depreciation. Faced with a demand for higher wages, CEDI suspended the operation of the mine on February 17, 1960, thereby precipitating a dispute with the Mexican agency which was settled by agreement of the parties some 7 years later. During the period from February 1, 1958 to December 31, 1960, *397 which are the years involved in this proceeding consolidated U.S. income tax returns were filed by Texasgulf on behalf of itself and its subsidiaries, including CEDI. During those years, CEDI admittedly sustained losses on the mining of the sulphur. In the determination of those losses, there is presented for decision (1) the accounting for royalties accrued but not paid, (2) the treatment of exploration and development costs which were capitalized or deferred, and (3) the valuation of inventories both at cost and at cost or market. [13] Finally, there is presented the question whether the cessation of operations at the Nopalapa mine on February 17, 1960, gave rise to a deductible loss on account of the abandonment or worthlessness of such mine, and, if so, the determination of the amounts which should be reflected as a part of that loss. First, there is thus the question with respect to the proper treatment of the so-called "royalty" payable to the agency of the Mexican government and the determination of the amount of such royalty *398 which should be accrued during the years involved. At the outset, the agreement between CEDI and Fomento with respect to the royalty provided that there should be due and payable a royalty equal to 15 percent of the value of the sulphur produced determined by reference to the Engineering & Mining Journal for the month of production. The royalty thus became due and payable when the ore was mined at a value determined on that date, irrespective when the ore was sold. Subsequently, this was amended to defer the time of payment of a portion of the royalty thus determined until the sulphur was either exported or shipped domestically. From this, the respondent argues that pursuant to Income Tax Regs. 1.461-1(a) 2), all events had not occurred which determined the fact of liability until the sulphur had been shipped for sale. Petitioner argues to the contrary, relying primarily on Washington Post Company v. United States,405 F.2d 1279 (Ct. Cl. 1969), with which case the respondent is in disagreement. Following the filing of briefs, the U.S. Court of Appeals for the Fifth Circuit promulgated its decision in Lawyers' Title Guaranty Fund v. United States,508 F.2d 1 (5th Cir. 1975), which *399 clearly would warrant accrual of the full amount of the royalty in question. In accordance with that decision, it is our opinion that the royalties due on account of the mining of the sulphur by CEDI should properly be accrued as a liability when the sulphur was mined, irrespective of any extension granted by Fomento postponing the date of payment of a part of the royalty due until the sulphur was shipped. In accounting for the royalties thus accrued, there are rules peculiar to the extractive industries. However, the parties directed their arguments primarily to rules applicable with respect to the accrual of a liability for tax purposes. The respondent by implication, at least, has conceded that any royalties properly accruable may be charged to inventory in the year accrued. For purposes of this case, therefore, the Court will sustain petitioners' right to charge to inventory the full amount of the royalties accrued in each year. [14] *400 Second, there is the question with respect to the proper treatment of exploration and development costs. In the acquisition of the Nopalapa mine, as of January 1, 1958, CEDI had incurred costs in the drilling of exploratory wells in the amount of $ 1,797,251.80 and development costs in the amount of $ 1,943,735.66, making a total exploration and development cost allocable to Nopalapa in the amount of $ 3,740,987.46. The petitioners made no election with respect to the exploration costs under secton 615. Accordingly, such costs must be credited to the capital account and are recoverable solely through the allowance of cost depletion. Rev. Rul. 58-358, 1958-2 C.B. 359. Petitioners elected to capitalize development expenditures pursuant to section 616. The respondent no longer contests the validity of that election. With respect to the depletion allowance, section 611 provides, in part, as follows: SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION. (a) General Rule.--In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as *401 a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. * * * The rules applicable to the computation of cost depletion are prescribed in Income Tax Regulations, section 1.611-2 (T.D. 6446, 1960-1 C.B. 208). Section 1.611-2 of the regulations provides that having determined the amount of the cost to be depleted, the cost depletion for each year shall be computed by dividing such amount by the number of units of mineral remaining as of the taxable year and multiplying the depletion units, so determined, by the number of units sold within the taxable year. Amortization of the development expenditures, which are capitalized pursuant to an election under section 616, is deductible in addition to depletion. The respondent now concedes that the petitioners made a timely election under section 616 to treat such costs as a "deferred expense" which thereby became "deductible on a ratable basis as the units of produced ores or minerals benefitted by such expenditures are sold." *402 Section 616(b). The parties are in agreement with respect to the capitalized costs and deferred development expenses which are chargeable to the units of sulphur produced by CEDI. The petitioners contend that the proportion of such costs applicable to the sulphur mined by CEDI should be included as a part of the cost of its inventories, thereby indirectly resulting in the deduction of such costs currently through the valuation of inventory at cost or market, whichever is lower. The respondent argues that this method of accounting results in the premature deduction of costs, which are otherwise unallowable as deductions, citing cases such as The Weather-Seal Manufacturing Co.,16 T.C. 1312, (1951), aff'd, 199 F.2d 376 (6th Cir. 1952) and R. J. Reynolds Tobacco Co.,T.C. Memo. 1956-161 (1956), affirmed on other issues 260 F.2d 9 (4th Cir. 1958). Both cases involve the question whether unreasonable compensation was includable in the cost of goods sold. The sole question presented in the case before us here is whether an amount admittedly allowable as a deduction when the sulphur is sold may be charged to inventory and recovered as a part of the cost of sales. It is not a question of whether *403 the deduction is proper, but whether what the petitioners seek to do in this case is a proper method of accounting for such deduction. In substance, respondent challenges the right of CEDI to include cost depletion and amortization of development expenses in inventory, because CEDI's inventories are valued at cost or market, whichever is lower, during a period when there were no sales of sulphur by CEDI. The valuation of the inventory at cost or market, whichever is lower, is an exception to the rule requiring a closed transaction. It is designed to permit a taxpayer to reflect an economic loss in a taxable year, notwithstanding that the goods on which the loss has been sustained are still in inventory. It should have no bearing on the question whether cost depletion or amortization of development expenses should be included in inventory. The respondent's regulations with respect to accounting for cost depletion--and amortization of development expenses would seem to fall in the same category--have undergone a change over the years. Regulations 111, section 29.22(a)-5 originally provided that "In determining the gross income subtractions should not be made for depreciation, depletion, *404 selling expenses or losses, or for items not ordinarily used in computing the cost of goods sold." In T.D. 6028, 1953-2 C.B. 100, section 29.22(a)-5 was amended by striking out that sentence and inserting in lieu thereof, the following: "In determining gross income, subtractions should not be made for depletion allowances based on discovery value or percentage of income, selling expenses, or losses, or for other items not ordinarily used in computing cost of goods sold." In explanation, Revenue Ruling 141, 1953-2 C.B. 101 made it clear that the inclusion of cost depletion as a part of the cost of sales in the amended regulations was permissive. After some 20 years, the respondent promulgated the so-called "full absorption" regulations (T.D. 7285, 1973-2, C.B. 163) which, if applicable to the years involved in this proceeding, would seem to require that the petitioner include cost depletion and amortized development expenses in inventory. Income Tax Regs. 1.471-11(c)(2). While these regulations were not promulgated until long after the years involved in this proceeding, respondent is hardly in a position to argue that the inclusions of such costs in inventory would be contrary either *405 to the law or to sound accounting principles. The respondent agrees that pursuant to the consolidated return regulations relating to inventories and applicable to the years in issue, CEDI's opening inventory of sulphur on hand as of January 1, 1958, should be valued at cost. Income Tax Regs., section 1.1502-39A. With respect to that inventory, the question is solely one of determining the proper cost. In its financial statements, CEDI included both cost depletion and amortized development expense in inventory. That method not only was permissive under the regulations then applicable to a U.S. corporation, but might be required under the respondent's current regulations. Accordingly, respondent's adjustments whereby such costs were eliminated from the 1958 opening inventory were in error. The respondent similarly objects to the costing of CEDI's closing inventory for the taxable year 1958 and subsequent years, for the same reasons set forth with respect to the 1958 opening inventory. Respondent argues that cost depletion and amortized development expense applicable to the sulphur mined during those years are not properly includable as a part of the cost of such sulphur. In taking that *406 position, respondent does not seek to require CEDI to conform its accounting with that of other members of the consolidated group. (See Income Tax Regs. section 1.1502-44(a)). The sole question is whether such method of accounting was proper under the law and regulations in effect during the taxable years involved. For the reasons heretofore stated, it is our opinion that the inclusion of cost depletion and amortization of development expenses in inventory was a recognized and proper method of accounting under the respondent's regulations. Furthermore, the adoption of this method for the opening inventory for the taxable year 1958 would seem to require that the same method be followed consistently thereafter. We so hold. Third, the parties are in disagreement with respect to the valuation at market of the closing inventories of CEDI. However, for purposes of this case we need only determine the market value of CEDI's closing inventory as of December 31, 1960. In its return for the taxable year 1960, the petitioners valued the closing inventory of CEDI as of December 31, 1960, at a value of $ 9 per ton by reference to the displacement cost of sulphur being produced by Texasgulf at its *407 other mines. The theory of such valuation was that the sulphur at Nopalapa was not worth anymore than the cost to Texasgulf of producing sulphur from its other mines. On brief, petitioners now argue that the sulphur in the closing inventory for the year 1960 should be valued at no more than $ 6.66 per ton. In their approach to the valuation of the sulphur in the closing inventory, petitioners failed to make any distinction between the value of the sulphur perse and petitioner's inability to sell such sulphur because of the "lawsuit" in which the petitioner was engaged with Fomento. Unquestionably, both the liability for the balance of the royalty (on account of which a deduction has already been allowed to CEDI) and the proceedings then pending as a result of the cessation of mining operations, inhibited the right of CEDI to remove and sell the sulphur in inventory. The latter had no bearing whatsoever on the value of the sulphur but was more in the nature of a counterclaim. The method followed by the petitioner in arriving at the value of $ 9 per ton differs from the method followed by the petitioner in prior years. As a starting point, the petitioner has not justified, nor has *408 the respondent accepted a change in that method. See All- Steel Equipment Inc.,54 T.C. 1749 (1970), affd in part and revd and remd in in part 467 F.2d 1184 (7th Cir. 1972); Thor Power Tool Co.,64 T.C. 154 (1975). In our opinion, however, the adjustment of $ 4 per ton used in the valuation of the sulphur inventory in prior years on account of the transportation costs should be increased as of December 31, 1960, to reflect the fact that such transportation no longer would be provided on an "ongoing basis." In other words, if it costs $ 4 per ton to move the sulphur to a deepwater port on an ongoing basis, a buyer of the sulphur would necessarily require an allowance of more than $ 4 per ton if the transportation were to be provided solely for the movement of the sulphur on hand at December 31, 1960. The fact that the movement of such sulphur would require an extended period of time must likewise be taken into consideration. Because of the foregoing, it is the opinion of the Court that the market value of the sulphur onhand at Nopalapa as of December 31, 1960, was not more than $ 12.00 per ton. The Court so finds. Finally, there is the question whether for the taxable year 1960 CEDI *409 is entitled to claim deductions under section 165 and section 167 on account of any losses it may have sustained by virtue of having closed its mining operations at Nopalapa. CEDI contends that as a result of the shutdown and the events occuring immediately thereafter, its entire operation at Nopalapa was rendered "worthless" as of the end of 1960. As a result, CEDI claims a deduction for the unrecovered cost (less salvage values) of the plant and equipment, as well as the amounts it expended for exploration and development. Several other miscellaneous items were also claimed as being without further value. CEDI claims it is entitled to a deduction in the total amount of $ 5,971,406.63 on account of such loss in value pursuant to sections 165 and 167 and the regulations thereunder. CEDI cites section 1.165-2, Income Tax Regs., as the basis for allowing the loss with respect to its nondepreciable assets and section 1.167(a)-8(a)(3), Income Tax Regs. , as the basis of loss as to its depreciable assets. Respondent, on the other hand, argues that except for securities which are specifically treated under section 165(g), no deduction is permitted under section 165 on account of economic *410 worthlessness alone. There must also exist an intent to abandon coupled with an act of abandonment. W. B. Davis & Son, Inc.,5 T.C. 1195 (1945). With respect to CEDI's depreciable assets, respondent contends that the pertinent regulation is section 1.167(a)-8(a)(4), Income Tax Regs. This regulation requires a physical act of abandonment as a prerequisite for claiming a deduction thereunder. Turning first to CEDI's alternate claim with respect to the deduction of exploration and development expenses, the parties seemingly have agreed that such costs should be deferred or capitalized ab initio. The Court has sustained the petitioners' right to include in inventory the proportion of such capitalized expenses applicable to the ore which had been mined prior to the cessation of activities. [17] That portion of the deferred costs would not be deductible even in the event of an abandonment of the mine. This leaves for consideration the portion of exploration and development cost applicable to the recovery of ore in the ground as of December 31, 1960. [18] *411 While the parties may agree with respect to the principles to be applied in determining whether CEDI sustained a deductible loss upon the cessation of mining activities on February 17, 1960, they are in disagreement with respect to the application of those principles to the facts in this case. Applying an objective test, the petitioners contend that the mine was worthless when it became apparent in 1960 that the mine could not be operated at a profit. The petitioners argue that a loss is deductible at that time regardless of subsequent events, citing cases such as Boehm v. Commissioner,326 U.S. 287 (1945); U.S. v. White Dental Co.,274 U.S. 398 (1927); A.J. Industries, Inc. v. U.S.,388 F.2d 701 (Ct. Cl. 1967), cert. denied 393 U.S. 833 (1968); A.J. Industries, Inc. v. United States,503 F.2d 660 (9th Cir. 1974). It may well be that when CEDI ceased operations on February 17, 1960, petitioners had no intention voluntarily of resuming operations under then existing conditions at Nopalapa. It must also be acknowledged that at least with respect to the exploration and development costs, CEDI had a worthless asset account on its books. It was not *412 likely that the Nopalapa mine could be operated at a profit perbooks. However, other factors must also be taken into account. First, while it must be conceded that there was no reasonable expectation of producing sulphur at Nopalapa on a basis that would enable CEDI to recover both the direct costs of mining and the indirect costs such as deferred development costs, depletion, and depreciation, those indirect costs had already been incurred and could not be avoided by abandoning the mine. The loss which might ensue upon the resumption of mining operations would not necessarily be any greater than the loss which would be sustained in the event of the abandonment of the mine. Secondly, as distinguished from the cases cited by petitioners, there were other considerations which precluded the abandonment of Nopalapa. CEDI was obligated by contract to proceed at Nopalapa. CEDI's rights to develop Texistepec were conditioned upon the fulfillment of that contract. For that reason, petitioners were not prepared to abandon Nopalapa. At no time during 1960 is there any evidence that CEDI intended permanently to cease operations at Nopalapa. In fact, the record shows just the opposite. The Chairman *413 of the Board of Texasgulf ordered the executive vice-president of CEDI in early 1960 to close down the mine if the dispute with the labor union could not be worked out. No mention was made that the shutdown was of a permanent nature. A skeleton crew was placed at the mine to keep the plant and equipment in proper working order, in addition to protecting the inventory stockpile. This action reflects a recognition on the part of CEDI that the shutdown was not permanent nor its assets worthless. Within a month after the shutdown, CEDI sent a letter to Fomento invoking the force majeure clause of the concession. A request was made that the contract be extended for however long the claimed force majeure continued. At no point did CEDI notify Fomento of an intention on its part to shut down the mine at Nopalapa permanently. By letter dated May 2, 1960, Fomento informed CEDI that it would rescind the contract unless CEDI prepared a written defense of its action within 90 days. This CEDI did, both to secure its rights to the inventory stockpile at Nopalapa and to preserve its rights to mine the Texistepec deposit. CEDI kept a skeleton crew at the mine at all times to keep the plant and equipment *414 in proper working order until the dispute was finally settled in 1967. It seems evident that CEDI always held open to the Mexican government the prospect of reopening the mine at Nopalapa. In fact, this was one of the primary conditions upon which the settlement agreement was finally reached in 1967. It is clear that as of December 31, 1960, the unamortized exploration and development cost applicable to the remaining sulphur in the ground would not be recovered through the mining and sale of that sulphur. The cost of mining and transporting alone equaled or exceeded the value of the sulphur produced. However, there is no provision in the statute for writing off capitalized exploration and development costs analogous to the valuation of inventory at cost or market, whichever is lower. Capitalized exploration and development costs are recoverable either as a deduction from the sales price for the ore or upon an actual abandonment of the mine. As of December 31, 1960, there had been no sales, nor had there been a definitive decision to abandon the mine. The future was a matter of liquidation or negotiation between CEDI and the Mexican authorities. Accordingly, CEDI did not sustain an *415 abandonment loss on account of the cessation of operations at the mine in the taxable year 1960. Decision will be entered under Rule 155.
Footnotes
1. Respondent has conceded in his brief that the opening inventory for the taxable year 1958 may be valued at cost.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.
3. In 1958, Texasgulf elected to have CEDI treated as a domestic corporation pursuant to sec. 1504(d), I.R.C. 1954↩.
4. In 1965, CEDI was paying the skeletal crew approximately $ 2,700 per month for their services.↩
*. CEDI produced a total of 322,243 long tons of sulphur of which 9,998 tons were "botton sulphur." Bottom sulphur is the first sulphur placed on the ground during stockpiling, or vatting, and was not considered to be recoverable or marketable.
5. In our findings of fact, the number of tons of sulphur produced by CEDI as of the end of 1957 was rounded off to 85,208 tons. For purposes of computing the opening inventory at $ 19 per ton above, however, CEDI used the exact tonnage figure of 85,208.210 tons.↩
6. The closing inventory at market value was $ 3,588,187.59. The closing inventory at cost was $ 3,934,862.81.↩
7. On its consolidated return for 1960, the full deferred expense of $ 1,098,407.62 was initially claimed as a loss and included as part of CEDI's inventory writedown from cost to market value. Petitioners have since conceded the nondeductibility of $ 31,497.48 in production txes.↩
8. Although the year 1957 is not before the Court, the manner in which CEDI is permitted to account for the socalled "cost depletion" in this year has a direct bearing on the amount of its inventory writedown in 1958. If CEDI is permitted to charge cost depletion to its inventory in 1957, CEDI effectively increases its opening inventory for 1958, thereby increasing the amount of the writedown for 1958 when its closing inventory is valued at market. Accordingly, as indicated above, respondent has computed CEDI's opening inventory for 1958 without the credit on account of "cost depletion" attributable to 1957.↩
9. At trial, Stephens spoke about setting the market value for sulphur at $ 12. Based on the facts before us, which are not entirely clear, we must assume Stephens was referring to the effective inventory value of the sulphur with the estimated royalty and tax charges included. These latter amounts approximated $ 3 per ton. ↩
10. In 1960, Texasgulf had sufficient sulphur inventory to sell on the market without regard to the Nopalapa stockpile. If the Nopalapa sulphur were moved out onto the market, it would have resulted in the displacement of sulphur having a production cost to Texasgulf of $ 10 - $ 12 per ton. It was this displacement factor that provided the basis upon which the Nopalapa inventory was valued.↩
11. For the taxable years 1958 and 1959, respondent has approved CEDI's action in writing down its inventory to $ 18 per ton.↩
12. This amount was originally charged by CEDI to cost of inventory in 1960. Since CEDI has conceded that this procedure was incorrect, such amount has been added back to the basis of its plant and equipment.
13. In determining these questions, the parties seemingly agree that U.S. accounting principles or criteria should govern. See Rev. Rul. 63-6, 1963-1 C.B. 126↩.
14. The so-called "royalty" applicable to the sulphur mined by CEDI was more in the nature of a severance tax. If regarded, however, as a royalty, the Mexican authorities had a lien on or interest in the sulphur which had been mined. If not charged to inventory as a cost, the accrued royalties would have to be reflected as a reduction in the market value of the inventory.
17. A total of 312,000 tons of sulphur was mined prior to February 17, 1960. ↩
18. A total of approximately 350,000 tons of recoverable sulphur remained in the ground as of February 17, 1960.