ENERGY RESOURCES LIMITED PARTNERSHIP, BAUMGARDNER OIL COMPANY, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Energy Resources Ltd. Partnership v. Commissioner
Docket Nos. 20022-87, 15977-88[1]
United States Tax Court
T.C. Memo 1992-386; 1992 Tax Ct. Memo LEXIS 414; 64 T.C.M. (CCH) 80; July 13, 1992, Filed *414 Decision will be entered for petitioner. Held: Partnership possessed sufficient incidents of ownership to entitle it to take deductions and credits at issue, if otherwise qualified. Partnership continued to be engaged in its trade or business and did not retire asset during years at issue; therefore, partnership was entitled to depreciation deductions for years at issue, partnership was permitted to amortize costs over years at issue and thus was not required to take increased amortization in 1983, partnership was entitled to an investment tax credit for 1983, and partnership was not required to recapture during any of the years at issue the investment tax credits taken in 1982 or 1983. For Petitioner: Theodore W. Hirsh. For Respondent: Deborah Y. Clark. WHITAKER
WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined adjustments in the partnership items of Energy Resources Limited Partnership (ERLP) as follows: Year
Depreciation
Amortization
ITC
Recapture
1983
$ 1,035,216
($ 594,144)
$ 563,168
$ 4,207,863
1984
1,032,520
36,763 1985
1,023,296
36,763 The issues for decision are: (1) Whether as a preliminary matter *415 ERLP had sufficient incidents of ownership to entitle it to the deductions and credits at issue when it did not possess legal title; (2) whether ERLP is entitled to depreciation for the years at issue; (3) whether ERLP may amortize its costs during the years at issue and thus should not have increased amortization for 1983; (4) whether ERLP is entitled to an investment tax credit for 1983; (5) whether ERLP must recapture in 1983 100 percent of the investment tax credit taken on its 1982 return; and (6) in the alternative, whether ERLP must recapture in 1984 80 percent of the investment tax credit taken on the 1982 return and 100 percent of the investment tax credit taken on the 1983 return. All of these questions are integrally related to the questions of whether the closing of an oil re-refining facility (the facility) in July 1983 constituted an abandonment of the business such that ERLP was no longer engaged in the trade or business or whether the facility was retired at that time. [2]
*416 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference. The facts as found in our opinion in Energy Resources Limited Partnership v. Commissioner, T.C. Memo. 1990-240, also are incorporated by this reference. We repeat here the facts as stated in our previous opinion to the extent necessary for an understanding of the present issues. ERLP was organized in 1981 as a Pennsylvania limited partnership. It was formed for the purposes of constructing and operating the facility, which was located in Southhampton Township, in Franklin County, Pennsylvania. The facility was expected to convert used lubricating oil (feedstock) into clean fuel oil, lubricating oil, and an asphaltic type of product, all of which could be sold and reused. A consulting engineer for the project was hired in 1981. At the time of ERLP's formation, the capital interests of the partners were as follows: Partner
Capital Interest Percent
Baumgardner Oil Co.,
General Partner
1
Elmer R. Baumgardner,
Limited Partner
50
Robert C. Embry,
Limited Partner
49
Petitioner Baumgardner *417 Oil Co. (Baumgardner Oil), of Fayetteville, Pennsylvania, is the tax matters partner for ERLP for the years 1983 through 1985 and was the general partner of ERLP during all relevant periods. Baumgardner Oil was in the business of collecting used oil, processing it, and reselling it as fuel oil. Elmer R. Baumgardner (Mr. Baumgardner) was the president of Baumgardner Oil. Robert C. Embry's (Mr. Embry) initial role in ERLP was to obtain financing. In order to assist in financing construction of the facility, the Franklin County Industrial Development Authority of Franklin County, Pennsylvania (the Authority), pursuant to a resolution adopted in November 1981, resolved to issue revenue bonds. The Authority's resolution stated that the project for which the proceeds would be used was the "Acquisition and construction of new facilities to re-refine used lubricating oil." Although the resolution had contemplated a lease/purchase arrangement, an Installment Sale Agreement (Agreement) dated December 1, 1981, between ERLP and the Authority was used instead. The Agreement provided that the Authority would issue bonds in an aggregate principal amount of $ 5 million to provide it with funds *418 to pay the cost of financing the project. By means of the terms of Article II of the Agreement, the Authority was to acquire and finance the project (which by definition included the land upon which the project was constructed) in the following manner: Under section 2.1 (the financing) of the Agreement, the Authority was to "undertake the acquisition, construction, financing and sale" to ERLP of the project. Under section 2.2 (transfer of portions of project under construction), those portions of the project that already had been built or were under construction were to be conveyed to the Authority. ERLP, however, was to be "entitled to physical possession and control of the Project at all times prior, during and subsequent to vesting of right, title and interest to the Project in it, and will be liable at all such times for all risk, loss and damages with respect to the Project." Under section 2.3 (award of construction contracts), ERLP was to have "full responsibility for preparing, administering, amendies [sic], the Construction Contracts." Under section 2.4 (provisions with respect to title), the construction contracts were to provide that "Title to the Project will vest in *419 the Authority as payment to the contractor for the materials, equipment and machinery * * * is made." That section also provided: The Company [ERLP] and the Authority agree that all of the Company's right, title and interest to the Project will vest in the Authority pursuant to the Construction Contracts: that the Project will remain personal property of the Authority until title thereto vests in the Company pursuant to Section 3.1 hereof, notwithstanding any attachment to the land; and that the Authority's title to the Project shall constitute ownership and not a security interest. Section 2.5 (issuance of bonds) provided that the Authority was to "issue, sell and deliver the Bonds to provide funds for the financing. If for any reason the Bonds are not issued, sold and delivered, the Authority shall have no obligation to cause the acquisition and construction of the Project." Section 2.6 (application of bond proceeds) provided that the proceeds received from the sale of the bonds were to be placed in various accounts to pay for placement costs, to service the debt incurred in connection with the bond sales, to meet any payments not made by ERLP on its Note, and in the Construction *420 Fund. Section 2.7 (disbursements from the construction fund) provided that funds in the Construction Fund were to be disbursed "to or at the order of the Company to pay the capital costs of the Project". ERLP covenanted that it would request funds from the Construction Fund only "to pay capital costs of acquiring, constructing and installing those components of the Project" which were identified in the project budget or in amendments thereto or to pay bond issuance costs that were not covered by other accounts and interest on the bonds "prior to the substantial completion of the Project". This section further provided that The Trustee may condition any disbursement from the Construction Fund upon its receipt of such additional information and documentation as it may reasonably require to evidence the truth and accuracy of the statements and representations contained in a Company's Certificate and Requisition. Under section 2.8 (investment of trust funds), the trustee was to invest the trust funds for the account of ERLP under ERLP's direction and any net loss from such investments was to be reimbursed by ERLP to the Trust Fund. Any funds remaining in the Construction Fund *421 after the project was completed were to be used to redeem the bonds. Under Article III of the Agreement, the project eventually was to be sold by the Authority to ERLP. Section 3.1 (vesting of title) provided: Upon payment in full of the Promissory Note issued hereunder, and after receiving a certificate from the Trustee that Authority's obligation to make payments of principal, interest, or premium, if any, on the Bonds has been fully discharged * * *, the Authority shall grant and convey to the Company all of the Authority's right, title and interest in the Project, and title, together with any related property interests, shall vest in the Company. * * * The Authority shall take no action which would encumber its right, title and interest in the Project, except such action as may be consented to in writing by the Company and SBA * * *. Under section 3.2 (purchase of project by Company), ERLP agreed to purchase the project from the Authority for a purchase price equal to the principal amount of the bonds issued by the Authority, to be evidenced by a promissory note (Note). Under section 3.3 (form, amount and installment payments) ERLP was to pay to the Authority installment *422 payments as set forth in the Note. Article IV of the Agreement deals with ERLP's responsibilities in connection with the Project. Under section 4.1 (completion of project) ERLP agreed to complete the project and, in the event that the moneys in the Construction Fund were insufficient to do so, ERLP was still required to complete construction at its own cost. ERLP was permitted to amend the construction plans as long as the project remained a qualified industrial development project. Upon completion of the project ERLP was to furnish the Authority with a certificate of completion. Under various other provisions, ERLP was responsible for all taxes, utilities, insurance and licenses in connection with the project and was obligated to maintain it and keep it in good repair. In the event of major damage to the project during the term of the Agreement, if insurance was insufficient to pay the full repair costs, ERLP nevertheless was required to complete the project at its own cost. The revenue bonds were issued under and secured by an Indenture of Trust between the Authority and The Equitable Trust Company of Baltimore, Maryland (the Trustee). As collateral for the bond financing, *423 the Trustee was given a mortgage on the facility. The obligation of ERLP to pay the principal and the interest due under this arrangement was guaranteed by the United States Small Business Administration (SBA). The re-refining process was to be accomplished in three stages: In the first stage, the dehydration stage, feedstock was to be introduced into the facility where it was to be heated to remove any water. In the second stage, the evaporation or distillation stage, the product resulting from the first stage was to pass through an additional heating and evaporation process whereby other contaminants were to be removed, and the resulting material was then to be condensed back into a liquid. In the third stage, the hydrofining stage, the oil was to be stabilized and made ready for marketing. The entire operation was to be controlled by a process computer. The facility was designed to ingest 15 million gallons of feedstock per year. Design work on the facility began in May 1982, and construction began in that year. Mr. Baumgardner was the executive officer in charge of construction and was onsite during the construction. By the end of 1982 the buildings and physical site *424 work were about 50 to 60 percent complete, and ERLP had expended $ 4,511,746 in connection with the facility. Probably at about this time, approximately 300,000 gallons of oil was placed in the facility to begin testing (shakedown). There appears to have been a dispute between Mr. Embry and Mr. Baumgardner about the costs of the facility. Mr. Embry originally believed that the facility would cost $ 5 million, and by late 1982 it was evident that it was going to cost considerably more. Mr. Baumgardner told Mr. Embry that an additional $ 1.4 million was needed to get the facility operational, and, on December 29, 1982, ERLP was reorganized to provide for the transfer of certain limited partnership interests and the admission of additional limited partners. In conjunction with the reorganization, ERLP obtained approximately $ 1.4 million in additional capital from the BALT Limited Partnership (BALT). BALT was admitted to ERLP as a limited partner under the provisions of the Amended Partnership Agreement (Amended Agreement). Mr. Embry ceased to be a partner of ERLP after the reorganization. He told the BALT partners that their investment would make the facility fully operational *425 and that it was primarily to be used as working capital. At least one BALT investor was under the impression that the facility was ready to process oil at that time. The funds received from BALT actually were to be used for construction. Under the Amended Agreement, the ownership interests of ERLP were as follows: Partner
Capital Interest Percent
Baumgardner Oil
1
Mr. Baumgardner
50
BALT
49
Pursuant to the provisions of section 6-C of the Amended Partnership Agreement, profits and losses of ERLP, other than those attributable to a Capital Event, were allocable as follows: Partner
Profits & Losses Percent
Baumgardner Oil
1
Mr. Baumgardner
2
BALT
97
At least some of the BALT investors perceived themselves as passive investors or lessors and had no intention of being involved in the day-to-day operations of the facility. Concurrently with the admission of BALT as a limited partner, ERLP also entered into an Operating Lease (Lease) agreement with Lube Tech, Inc. (Lube Tech), a Maryland corporation, for a 6-year term, commencing on December 29, 1982. Lube Tech was formed by Mr. Baumgardner, Mr. Embry, and David Cordish, who had assisted in the original *426 formation of ERLP. Under the terms of the Lease, ERLP agreed to lease the facility to Lube Tech in consideration for base annual rent and percentage rent, as defined under section 5 of the Lease. ERLP was also entitled to additional rent equal to the real estate taxes due and payable on the facility. ERLP and Lube Tech agreed that the facility was being leased in its "as is" condition. By early 1983, ERLP's financial situation deteriorated. Additional funds were needed for further construction of the facility and to pay vendors who had completed their assigned tasks. Some of the contractors involved in the construction of the project were not paid by ERLP in a timely manner. It appears that ERLP did not make any payments on its Note to the Authority. Baumgardner Oil paid some of ERLP's bills at that time. In May 1983 the design/build contractor of the physical plant stopped work because it had not been paid for its services performed in March and April. Mr. Baumgardner remained on good terms with the contractor and assured him that he would be paid once more money was raised. During early 1983, in addition to the financial difficulties, two major technical problems arose *427 in connection with the facility. One involved a weld seam in the condenser of the second stage that had not been properly closed by the manufacturer, which allowed the contaminated feedstock to mingle with the partially re-refined oil in stage two. About 200,000 gallons of the oil was run through the evaporator system, and finally it was necessary to enter the condenser to detect the location of the defect. After this was repaired, the computer that controlled the facility became inoperable. After the manufacturer spent several weeks trying to fix it onsite, it was sent to California for repairs and was not returned for a month or 6 weeks. Sometime in mid-1983, [3] Lube Tech defaulted on its payment obligations under the Lease. In July 1983, ERLP's financial situation became so bad that it had to lay off most of its personnel and shut down the facility. When the computer was returned thereafter, the plant could not be refired because of insufficient funds to rehire personnel. Just prior to shutdown there were between 300,000 and 500,000 gallons of oil in the facility. *428 Other than the problems with the faulty weld seam and the computer, construction of the facility was substantially but not fully completed at the time of the shutdown. The major stages in the re-refining process had been operated to some degree prior to that time. The biggest construction gaps involved the first, or dehydration, stage. Construction and installation of most of the equipment required to process the feedstock through this stage was operational, although the extent to which it was actually operated is unclear on this record. [4] Some minor piping and insulation needed to be finished. In spite of the weld seam problem in stage two, the computer breakdown, and other minor mechanical problems in stage three, construction of the equipment was largely complete, and the other stages were operative, by the time of the shutdown. Because of all the problems, however, the facility was not capable of producing salable lubricating oil when it was shut down in mid-1983. About 20,000 gallons of used oil went through shakedown, which did produce some salable fuel oil. The facility produced no oil after it was shut down. *429 Throughout the construction process, ERLP and Mr. Baumgardner kept the Department of Environmental Resources of the Commonwealth of Pennsylvania (DER) advised of the progress on the construction of the facility. Because of the potential environmental impact from the operations of the facility, ERLP was required to obtain operating permits from the DER in order to construct and operate the facility. With regard to solid waste, a one-time solid waste permit had to be issued by the DER Bureau of Solid Waste after a review of the construction plans before construction could begin. Construction was inspected by DER personnel. After construction was completed, the applicant had to certify that the facility was built according to those plans. On July 27, 1982, a solid waste permit was issued to ERLP by the DER Bureau of Solid Waste to construct and operate an oil re-refining facility. DER's biggest concerns involved the potential for sinkholes on the property and the construction of a proper impoundment to contain any spills that might occur. Most of the required certifications were supplied to DER prior to shutdown, but the impoundment certification was not. A communication between *430 the regional solid waste manager and Mr. Baumgardner in early 1983 concerning the impoundment states that "the facility is not to be placed in service until an inspection of the lagoon [impoundment] facility has been made by DER personnel." Despite continuing negotiations, this issue was never fully resolved. With regard to air quality, a two-step process was involved. In the first step, referred to as the plan approval, a construction and temporary operating permit was required, during which the facility was to be built and tested. In the second step, the applicant had to demonstrate to DER through testing procedures or inspections that the facility was built as planned and, if satisfied, DER issued a permanent operating permit. On March 8, 1982, ERLP applied to the DER Bureau of Air Quality Control for plan approval for construction of the facility and for a temporary operating permit to operate it. Two plan approvals (one for the plant itself and one for the combustion units) were issued on July 27, 1982, to expire early in 1983. Temporary operating permits authorized construction and operations for start up, debugging, and emissions testing at the facility. Each temporary *431 operating permit was contingent upon conditions prescribed by the DER. After several extensions were requested and granted, both temporary operating permits expired in December 1983 or March 1984. The facility never received a permanent operating permit, since the authorities did not finally approve the plant's performance in the required tests. After the layoffs, ERLP's principals performed maintenance of the facility, and, as fall 1983 came on, they winterized the plant by adding antifreeze to the water pipes or by draining them to prevent freezing during the cold weather. They also lubricated the equipment regularly and continued to turn it over. These efforts continued through 1983. In late 1983, Mr. Baumgardner obtained permission from the SBA to remove certain laboratory testing equipment from the facility in an effort to continue collecting used oil from various local sources and testing the quality of that oil. This was done with the intention of preserving a source of feedstock when the facility reopened. Finding of these sources for the facility was difficult and was a primary concern to Mr. Baumgardner. The equipment also was of use to Baumgardner Oil. Oil was *432 removed from the facility at about the same time. At the end of 1983, the SBA took over the responsibility of maintaining a guard for the facility, and thereafter ERLP's principals were denied access. In the hope of resuming operations of the facility, Mr. Baumgardner and others on behalf of ERLP made many efforts to resolve ERLP's financial difficulties by meeting with prospective investors. Various types of arrangements were proposed to potential purchasers of Lube Tech, as well as potential joint venturers or operators of the facility. Proposals to sell the facility also were under consideration. While BALT investors were approached about providing additional funds for working capital, they declined to do so. They did, however, attempt to find a successor for Lube Tech in order to keep the project alive. The efforts to raise money or find a new lessee, which continued through the years at issue, proved to be unsuccessful. Declining oil prices, environmental concerns, and reputed disputes among the principals were some of the reasons expressed by potential investors for their unwillingness to contribute the funds necessary to resume operations of the facility. On January *433 23, 1984, an involuntary petition in bankruptcy was filed by certain of the unsecured creditors of ERLP seeking a liquidation of ERLP under chapter 7 of the Bankruptcy Code. At the request of ERLP, on February 23, 1984, the bankruptcy proceeding was converted to a chapter 11 reorganization. ERLP was appointed debtor in possession, and was "authorized to manage its affairs in the ordinary course of business". On February 24, 1984, [5] Lube Tech filed a voluntary petition in bankruptcy under chapter 11 of the Bankruptcy Code. The SBA was called upon to honor its guaranty of repayment of the principal and interest of ERLP's promissory note to the Authority. Upon payment to the Trustee of $ 4,681,830.80 under the guaranty, the SBA acquired the rights of the Trustee to the collateral under the Indenture of Trust. However, an automatic stay was granted to ERLP under section 362 of the Bankruptcy Code, 11 U.S.C. section 362 (1988), which prevented the SBA from foreclosing on the collateral. *434 During 1984, the facility's buildings deteriorated, and animals were found on the premises. To preserve its collateral, the SBA expended $ 93,017.01 for guard service, pest control, electricity, heat, telephone, and other related services. In September 1984, ERLP's principals and a potential investor negotiated a transaction that would have resulted in additional financing for the project, and a new company would have replaced Lube Tech's role as lessee. In the course of these negotiations, Mr. Baumgardner apparently wrote to the DER regarding the status of permits for the facility and made requests concerning the permit procedures in the event the facility were transferred or operations were resumed after a change of ownership. Five unresolved environmental concerns were addressed in the DER response. The negotiations were never finalized, however. Additional negotiations with others occurred through 1985. On October 16, 1985, the SBA filed a motion to lift the automatic stay, which was denied by the bankruptcy judge at ERLP's request in order to give ERLP an additional 6 months to find additional investors for the facility. ERLP's principals thereafter continued in their *435 efforts to find investors, but they proved to be unsuccessful. By means of a creditors' committee, contact was maintained by ERLP's principals with the contractors who had worked on the facility to ensure their cooperation in the event that the facility was restarted. On June 4, 1986, the SBA filed a motion to sell the facility free and clear of liens. Mr. Baumgardner and Baumgardner Oil objected to the sale arranged by the SBA. In his objection to the SBA's motion, Mr. Baumgardner alleged that the SBA had interfered with his attempts and those of others to obtain financing for the facility. On August 17, 1986, the bankruptcy judge signed an order authorizing sale of the facility to a company called Safety-Kleen Corp. (Safety-Kleen). Safety-Kleen was one of the prospective investors contacted by ERLP in its efforts to raise additional capital for the facility. On September 9, 1986, the facility was sold to Safety-Kleen for $ 2,200,000. Under the terms of the sale, the SBA was paid $ 2 million and the remaining $ 200,000 went to pay taxes, certain expenses, and unsecured creditors. Federal income tax returns were filed on ERLP's behalf for the years 1982 through 1985 at the *436 Philadelphia Service Center. On its 1982 calendar year Federal income tax return, ERLP reported gross rents from Lube Tech under the Lease in the amount of $ 56,177. On that return, ERLP also elected and claimed $ 4,211,746 as an investment tax credit with respect to the facility, consisting of $ 9,708 of property with a 3-year life and $ 4,202,038 with a 5-year life. The 1982 return showed the partnership's principal business activity to be an "Oil Refinery" of "Lubricants". ERLP received a letter dated April 7, 1986, from the IRS District Director informing ERLP that no adjustment was required for the tax reported on its 1982 tax return. On its 1983 calendar year Federal income tax return, ERLP reported gross rents from Lube Tech under the Lease in the amount of $ 545,312. It also took a depreciation deduction in the amount of $ 1,035,216 and an investment tax credit of $ 563,168 on that return. The 1984 and 1985 returns showed no rental income for either year. ERLP took depreciation deductions of $ 1,032,520 for 1984 and $ 1,023,296 for 1985. The 1983, 1984, and 1985 returns showed amortization in the amount of $ 36,763 for each year and indicated that the partnership's *437 principal business activity was the "Leasing" of "Equipment". Respondent issued a notice of final partnership administrative adjustment (FPAA) with regard to ERLP's 1983 return on March 30, 1987. [6] The FPAA stated that ERLP was not entitled to the depreciation deduction taken on the 1983 return because the facility was abandoned when it ceased operation in July 1983 and was no longer operated as a trade or business. For the same reasons, the FPAA indicated that ERLP was not entitled to the investment tax credit taken on the 1983 return and was required to recapture 100 percent of $ 4,207,863 of the investment tax credit taken previously because the operational portions of the facility were not in service for more than 1 year. Respondent also increased the amount allowed for the writeoff of unamortized costs from $ 36,763 taken on the 1983 return to $ 594,144. On March 31, 1988, respondent issued an FPAA to ERLP with regard to ERLP's calendar year 1984 and 1985 tax returns. That FPAA indicated that ERLP's depreciation deductions for 1984 and 1985 were not allowed for the same reason stated in the earlier FPAA -- that ERLP had ceased operation in 1983, and that the plant was abandoned *438 and was no longer operating a trade or business during those years. It also stated that the amortization shown on the returns for each of the 2 years was not allowed because the full amount of unamortized costs had been allowed in ERLP's final year of operation, 1983. Petitioner filed timely petitions with this Court. At the time the petitions were filed, petitioner's residence and ERLP's principal place of business was Fayetteville, Pennsylvania. In the first petition concerning the year 1983, petitioner *439 contends that respondent erred in disallowing the depreciation deduction, in increasing the amortization expense, in disallowing the investment tax credit taken on ERLP's 1983 return, and in requiring the recapture in 1983 of the investment credit taken on the partnership's 1982 return. In connection therewith, petitioner claims that the partnership had made a proper amortization election, that the facility was not abandoned or disposed of during 1983, that the facility was in service, and that the facility did not cease to be section 38 [7] property during that year. The second petition involves the years 1984 and 1985. Petitioner therein again claims that respondent erred in disallowing ERLP's amortization expenses and depreciation deduction claimed for both years, in that the partnership had made a proper amortization election, and that the facility was not abandoned during those years. *440 OPINION Issue 1. Benefits and Burdens of Ownership
A preliminary issue involves whether ERLP is entitled to any tax benefits in connection with this facility when it did not have legal title to it under the terms of the Installment Sale Agreement. See Helvering v. Lazarus & Co., 308 U.S. 252, 254 (1939). After a review of that agreement, we are satisfied that, if it otherwise qualifies therefor, ERLP owned sufficient incidents of ownership to allow it to take depreciation deductions and investment tax credits despite the absence of legal title. See Sun Oil Co. v. Commissioner, 562 F.2d 258, 262- 268 (3d Cir. 1977), revg. T.C. Memo. 1976-40; cf. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). As described above, ERLP was responsible for constructing and maintaining the facility, insuring it, paying its taxes, and procuring and paying for its licenses and utilities. ERLP was responsible for preparing and carrying out the construction contracts and, to the extent that they were properly applied, had control over the moneys in the Construction Fund. Any net loss from investments *441 of the trust funds during the term of the Agreement had to be borne by ERLP. Any funds beyond those raised by the sales of the bonds which were necessary to complete the project had to come from ERLP. Significantly, the risk of loss beyond insurance coverage and the potential for gain in the event that the project was successful rested with ERLP at all times. Accordingly, we hold that, notwithstanding its lack of legal title, ERLP had sufficient incidents of ownership to entitle it to take the deductions and credits at issue, if it otherwise satisfies the requirements discussed below. Issue 2. Depreciation
The next issue for decision is whether ERLP is entitled to depreciation deductions during the years at issue. Respondent in the two FPAA's issued as to ERLP indicated that these deductions were disallowed because ERLP abandoned the facility when it was shut down in July 1983, thereby terminating any trade or business in which it had been previously involved. This raises the interrelated questions of whether ERLP was engaged in its trade or business and whether it retired or abandoned the facility after the shutdown. In our prior opinion in this case, we found that *442 respondent in effect had conceded that the facility had been placed in service in 1982 and 1983. [8]Energy Resources Limited Partnership v. Commissioner, T.C. Memo. 1990-240. This presumes the existence of a trade or business in which ERLP was engaged. Accordingly, we hold that ERLP was engaged in the trade or business of owning, managing, and leasing an oil re-refining facility at least up until the facility was shut down in July 1983. [9]
*443 With regard to the period after that date, respondent takes the position that ERLP "did not engage in the trade or business of re-refining oil after the shutdown." Petitioner contends that ERLP continued to engage in the business of leasing the facility as manifested by its attempts to find a new lessee. The determination of whether activity rises to the level of a trade or business is inherently factual in nature. Commissioner v. Groetzinger, 480 U.S. 23, 36 (1987); Higgins v. Commissioner, 312 U.S. 212, 217 (1941); see Ditunno v. Commissioner, 80 T.C. 362, 367-370 (1983). The trade or business determination must be made at the partnership level. Brannen v. Commissioner, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). In Commissioner v. Groetzinger, supra at 35, the Supreme Court indicated the importance of the continuity and regularity of the activity involved. This Court, in determining whether parties have engaged in a trade or business, similarly has focused upon the level of activity in question. Ditunno v. Commissioner, supra at 371-372; *444 Austin v. Commissioner, 35 T.C. 221, 225 (1960), affd. 298 F.2d 583 (2d Cir. 1962); Wright v. Commissioner, 31 T.C. 1264, 1267-1268 (1959), affd. 274 F.2d 883 (6th Cir. 1960). [10] See Stanton v. Commissioner, 399 F.2d 326, 329 (5th Cir. 1968), affg. T.C. Memo. 1967-137. Property is used in a trade or business if it is "devoted to the trade or business." P. Dougherty Co. v. Commissioner, 5 T.C. 791, 795 (1945), affd. 159 F.2d 269 (4th Cir. 1946) (quoting Kittredge v. Commissioner, 88 F.2d 632 (2d Cir. 1937), affg. 34 B.T.A. 1314 (1936)). *445 We hold that ERLP continued in its trade or business. During the years at issue, ERLP's principals took every possible step to continue the project by means of every avenue they could pursue. During 1983 they performed maintenance of the facility and winterized it. When the money for maintenance ran out, the SBA assumed the maintenance and security responsibility. ERLP's principals requested renewals of operating permits. They continued to test the quality of the feedstock in order to maintain a source of supply. They made repeated attempts to raise money in order to resume operations of the facility. When the bankruptcy petition was filed in early 1984, they saw that ERLP was appointed debtor in possession. During that year, they repeated their efforts to raise money to keep the project alive and, during September, appeared to be close to being successful. Mr. Baumgardner apparently contacted the DER about the facility's permits in the event that the deal went through. In 1985, ERLP through its principals continued its efforts to raise money. They also resisted efforts by the SBA to foreclose on the facility and were given additional time by the bankruptcy judge to continue *446 in their fundraising efforts. Throughout the years at issue, they maintained contact with the contractors on the creditors' committee in order to have their support when the facility was refired. These are acts of business activity. [11]
*447 Furthermore, there is no evidence that ERLP retired the facility during the years before the Court. The regulations provide that the period for depreciation "shall end when the asset is retired from service." Sec. 1.167(a)-10(b), Income Tax Regs. A "retirement" is defined as "the permanent withdrawal of depreciable property from use in the trade or business or in the production of income." Sec. 1.167(a)-8(a), Income Tax Regs. Examples of retirement described therein include by sale or exchange, or by actual abandonment. Property devoted to a trade or business does not lose its business character merely because it ceases to be actively used in the trade or business. Graves Brothers Co. v. Commissioner, 17 T.C. 1499, 1506 (1952). The Court of Appeals for the Second Circuit in Kittredge v. Commissioner, supra at 634, long ago held that a factory that once had been used but lay idle during the years at issue was still "used in the trade or business" of the taxpayer, applying the following standard: property once used in the business remains in such use until it is shown to have been withdrawn from business purposes. * * * there is *448 nothing in the stipulated facts to indicate that the petitioner abandoned the property or did anything to withdraw it from his business; he merely failed to find a tenant or to operate it for himself during the years in question. * * * We hold that the facility continued to be used in ERLP's business because there is no evidence that it was withdrawn therefrom. The facts here also are in many ways similar to those in Uri v. Commissioner, T.C. Memo. 1989-58, affd. 949 F.2d 371 (10th Cir. 1991). There we addressed the issue of whether property that had been placed in service lost its depreciable nature because the corporation ceased first its retail operations, and then all business operations. The corporation was in the business of renovating a building and operating a shopping mall on the premises, which included the operation of retail shops, a delicatessen, and a dinner theater. After a decline in the local economy, the corporation ceased operation of its retail businesses and generated $ 294 from the rental of its dinner theater. Thereafter the corporation was involved in settlement negotiations with the SBA, and arrangements with creditors *449 under chapter 11 of the Bankruptcy Code. We concluded that this activity was sufficient to hold that the assets remained depreciable because "the corporation's operations had not been permanently discontinued and the assets had not been withdrawn from the business." Respondent attempts to distinguish Uri on the ground that in that case the corporation had been in business for over a year, whereas here "it is clear that the partners were only attempting to sell the Facility." By this we assume respondent means that the business activity here was significantly less than in Uri. However, respondent admits that "the organizers [of ERLP] made several attempts to locate additional financing for the project". If anything, ERLP participated in more businesslike activity than the taxpayers in Uri, as described above. We therefore do not agree with respondent's distinction. Nor do we see evidence of abandonment as that term is used in tax law. In allowing a loss to be recognized where an asset is retired by actual abandonment, the regulations provide: "In order to qualify for the recognition of loss from physical abandonment, the intent of the taxpayer must be irrevocably *450 to discard the asset so that it will neither be used again by him nor retrieved by him for sale, exchange, or other disposition." Sec. 1.167(a)-8(a)(4), Income Tax Regs. Case law on the recognition of losses under section 165 indicates that, in order to be entitled to an abandonment loss a taxpayer must show "an intention 'to abandon the property, coupled with an act of abandonment, both of which must be ascertained from all of the surrounding facts and circumstances.'" Massey-Ferguson, Inc. v. Commissioner, 59 T.C. 220, 225 (1972) (quoting Boston Elevated Railway Co. v. Commissioner, 16 T.C. 1084, 1108 (1951), affd. 196 F.2d 923 (1st Cir. 1952)). We also have stated that "Abandonment constitutes not merely shrinkage in value but the complete elimination of all value in an asset, and the recognition by the owner that the asset is of no utility to him." Haspel v. Commissioner, 62 T.C. 59, 71 (1974). We see no evidence in the record of such intent or recognition, nor is there any clear act of abandonment. In our Memorandum Opinion in Finley v. Commissioner, T.C. Memo. 1974-229, we were *451 presented with facts quite similar to those in the instant case in a situation where the taxpayer was attempting to take an abandonment loss on his property under section 165. The taxpayer was involved in a real estate development project that never came to fruition. We found there that the following factors constituted acts evidencing a lack of abandonment: The taxpayer engaged in negotiations to revive the project up until the time of a foreclosure sale; he requested and was given lengthy extensions of time in which to try to rescue the project or to sell it; he contacted potential buyers; and he expressed a determination to do everything possible to revive the project until the last possible moment.[12] Similar behavior was exhibited here, as described above. Thus the fact that the facility was shut down in July 1983 is not controlling. The level of activity displayed by ERLP's principals does not indicate a recognition by them that the project was "of no utility", nor were there any acts of abandonment or evidence of an intent to abandon the project. To the contrary, there was considerable evidence of an intention to continue in their endeavors to get the facility going again. *452 Accordingly, we hold that ERLP's activity during the years at issue did not exhibit an intent to retire or abandon the facility and was sufficiently extensive, repeated, continuous, or substantial to constitute a continuation of the trade or business. Therefore ERLP was entitled to continue depreciating its assets during the years at issue. Issue 3. Amortization
In the 1983 FPAA, respondent included an adjustment increasing allowable *453 amortization of unamortized costs by $ 594,144 and consequently in the 1984 and 1985 FPAA disallowed the amortization amounts that had been taken by ERLP in those years. Respondent's brief indicates that, under respondent's "primary position * * * the Facility was not used in a trade or business after [sic] 1984 and 1985." Respondent's brief further indicates that, if respondent does not prevail in the "primary position", the additional amortization that was allowed in the 1983 FPAA should be disallowed and the amortized costs disallowed in the 1984 and 1985 FPAA should be allowed. Because we have held that the facility continued to be used in the trade or business during all the years at issue, respondent's "primary position" does not prevail. Accordingly, the amortization costs taken on the returns as filed will stand, and respondent's 1983 adjustment of increased amortization is not sustained. Issue 4. Investment Tax Credit
Respondent's contention with respect to the investment tax credit is closely related to the depreciation argument. Respondent's counsel asserts that, when the facility closed in July 1983, it ceased to be section 38 property. Therefore, it is argued, *454 the investment tax credit taken in 1983 should not be allowed and the investment tax credits taken on the 1982 and 1983 returns should be recaptured. Section 47(a)(1) as in effect during the years in issue provides for a recapture of the investment tax credit if, "during any taxable year any property is disposed of, or otherwise ceases to be section 38 property with respect to the taxpayer, before the close of the useful life which was taken into account in computing the credit under section 38". Insofar as is pertinent here, section 38 property is defined as property "with respect to which depreciation * * * is allowable to the taxpayer". Sec. 1.48-1(a), Income Tax Regs. We already have discussed the reasons why we find that ERLP continued in the trade or business during 1983 and therefore that depreciation is allowable for 1983. Therefore, the facility was section 38 property during 1983, and no recapture is required. [13]
*455 Respondent makes the alternative contention that, even if the recapture is not required during 1983, it should be required in 1984. This issue, which was not raised in the FPAA, was raised for the first time in respondent's pretrial memorandum, although there respondent contended that, in the alternative, recapture should occur in either 1984 or 1985, whereas respondent's post-trial brief refers only to an alternative of recapture in 1984. We assume that respondent has abandoned the argument of recapture in 1985 and now wishes us only to focus upon 1984. In respondent's brief respondent seeks to recapture in 1984 80 percent of the credit claimed in 1982 and 100 percent of the credit claimed in 1983. Respondent bears the burden of proof with respect to this issue. Rule 142(a). As we indicated in our prior opinion in this case, we do not look favorably upon the raising of factual issues at such a late date that the opposing party cannot possibly prepare for trial with respect to those issues. Nevertheless, we address the issue here sufficiently to state that respondent will not prevail. There are no facts in the record in support of recapture in 1984. There was no extraordinary *456 event or change in circumstances that would cause us to find a cessation of the business during that year. Respondent claims that "the Facility continued to be inoperative in 1984 and absolutely no activity occurred." This disregards the efforts on the part of Mr. Baumgardner and others to continue in their efforts to raise additional funds. The removal of equipment from the premises was explained by Mr. Baumgardner as an effort to maintain a source of supply by continually testing the feedstock. While the bankruptcy petition did occur during 1984, section 1399 expressly provides that no separate taxable entity results from commencement of a case under title 11 of the United States Code; accordingly, there was no transfer of the partnership assets to a separate bankrupt entity, which might give rise to an inference of "early disposition", and which might trigger recapture under section 47(a)(1). Moreover, in the course of the bankruptcy proceedings, ERLP through its principals continued to protect the long-term viability of the project by averting a foreclosure sale by the SBA. Throughout this period, ERLP continued to operate the business by attempting to raise additional funds *457 and by negotiating with the SBA and the bankruptcy court. See Uri v. Commissioner, T.C. Memo. 1989-58. Therefore, we conclude that respondent's alternate argument in favor of recapture during 1984 also is unpersuasive. Decisions will be entered for petitioner. Footnotes
1. The above-referenced cases were consolidated for purposes of trial, briefing, and opinion on Nov. 6, 1989.↩
2. At trial, respondent attempted to raise the new issue that ERLP's property had not been placed in service prior to its closure in 1983. We allowed the issue to be tried but required respondent to set forth her position in a post-trial motion. In Energy Resources Limited Partnership v. Commissioner, T.C. Memo. 1990-240↩, we held that respondent could not amend her answer to raise the new issue. Accordingly, the contention of respondent that ERLP's oil re-refining facility had not been placed in service prior to its closure in 1983 is not before the Court.
3. The record does not indicate the exact date of the default, but we assume that it coincided approximately with ERLP's serious financial downturn in early and mid-1983. We note that the 1983 annual rental was set at $ 1,031,125, which on a monthly basis constituted $ 85,927. Rental payments in the amount of $ 545,312 were reported on its return as received by ERLP in 1983. Thus Lube Tech's default probably occurred around mid-year.↩
4. Certain testimony indicates that the water treatment facility for the water that was removed from the feedstock during this stage had not yet been constructed. Water that had been removed during shakedown was being accumulated onsite and trucked away on a temporary basis. Other testimony indicates that, although the dehydrator was operative, the stacks on the heaters required by State law were not yet installed so that the dehydrator could not be legally used. Thus, during shakedown to test the later stages, oil that had been processed through the first stage at the nearby Baumgardner Oil facility was placed into the facility, heated in the first stage, and then run through the rest of the system. Because it was a duplicate of the dehydrator at the Baumgardner Oil facility, however, the construction supervisor indicated that he was confident that it would work. Because of the inherent inconsistency between these two portions of the testimony, we are unable to determine whether the first stage was in fact operated.↩
5. The stipulation indicates the date of this petition in bankruptcy to be Feb. 24, 1983, but we have found other record support for the more logical finding that the petition was filed in 1984.↩
6. Unlike petitioner, we attach no significance to the fact that respondent issued a duplicate notice of final partnership adjustment (FPAA) to ERLP on May 1, 1987, which contained information identical to that in the first FPAA. Respondent's answer in docket No. 20022-87 explained that the first FPAA was mailed to petitioner as the Tax Matters Partner, and the second was sent to each partner, in compliance with respondent's manual and sec. 6223(a) of the Internal Revenue Code of 1954↩ in effect for the years at issue.
7. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
8. We note that the regulations state that, for purposes of the investment tax credit, property shall be considered placed in service when "Equipment is acquired for a specifically assigned function and is operational but is undergoing testing to eliminate any defects." Sec. 1.46-3(d)(2)(iii), Income Tax Regs. Many of the rules pertaining to the investment tax credit go hand-in-hand with the allowance for depreciation. See sec. 1.48-1(a), Income Tax Regs.↩ If we apply the above standard to the depreciation issue, the record shows that at the time of the shutdown the facility was sufficiently operational to perform shakedown. Thus the fact that all aspects of construction were not fully completed and final licensing approvals had not yet been received is not controlling. 9. Because of the close similarity between the owners of ERLP and the shareholders of Lube Tech, we do not agree with petitioner that ERLP entered solely into the leasing business when it signed the lease with Lube Tech in 1982. It did, however, enter into the trade or business of owning and managing the facility, which would include as one of its functions attempts to re-lease the facility when it later became necessary to do so. An argument also could be made that ERLP was engaged in this trade or business even prior to the lease, since ERLP performed a substantial number of business and managerial functions prior to that point. Because the issue of whether the facility was placed in service prior to shutdown is not before the Court, we need not decide this question.↩
10. The Supreme Court and this Court also have required an objective to produce a profit, Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Brannen v. Commissioner, 78 T.C. 471, 501 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Fischer v. Commissioner, 50 T.C. 164, 171↩ (1968). Since there is no indication by the parties in either the FPAA's or elsewhere in the record that profit objective is at issue in this case, we focus our attention upon the first factor, the level of ERLP's activity.
11. Respondent also contends that the so-called "temporarily idle" cases (see, e.g., P. Dougherty Co. v. Commissioner, 159 F.2d 269 (4th Cir. 1946); Piggly Wiggly Southern, Inc. v. Commissioner, 84 T.C. 739 (1985), affd. 803 F.2d 1572 (11th Cir. 1986); Yellow Cab Co. v. Driscoll, 24 F. Supp. 993↩ (W.D. Pa. 1938)), in which respondent states that depreciation was allowed where the asset was not in actual use during the year at issue but was "devoted to the business of the taxpayer and ready for use should the occasion arise", do not apply here because the taxpayers in those cases were in their businesses apart from the assets in question. However, ERLP also comes under that category. As described above, its principals engaged in numerous business activities designed to keep the project viable, apart from the actual physical operations of the facility. Their efforts to raise additional funds to refire the facility and their attempts to keep it from foreclosure constitute some of the business activities that continued despite the closure of the physical plant. Therefore, respondent's attempts to distinguish these cases do not prevail.
12. Other Memorandum Opinions of this Court contain factual similarities to the instant case. In Equity Planning Corp. & Subsidiaries v. Commissioner, T.C. Memo. 1983-57, we held that the taxpayer was not entitled to an abandonment loss primarily because of continuing efforts to retrieve value from the investment and the absence of an overt act evidencing abandonment. In Texasgulf, Inc. v. Commissioner, T.C. Memo. 1976-39↩, we held that there was no abandonment because there was no indication that the shutdown of a plant was to be permanent.
13. Respondent also references sec. 1.47-2(a)(2)(i), Income Tax Regs., which describes the general rule of when property "ceases" to be sec. 38 property: A determination of whether section 38 property ceases to be section 38 property with respect to the taxpayer must be made for each taxable year subsequent to the credit year. Thus, in each such taxable year the taxpayer must determine, as if such property were placed in service in such taxable year, whether such property would qualify as section 38 property (within the meaning of § 1.48-1) in the hands of the taxpayer for such taxable year. For the same reasons discussed earlier, we find that there was ample evidence of business activity during all the years at issue and, if the facility had been placed in service in 1983, 1984, or 1985, it would have qualified for depreciation during those years.↩